UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OSWALDO NIEVES, JR.,

       Plaintiff,

  -v-

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

CIVIL ACTION NO.: 20 Civ. 8873 (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE**, United States Magistrate Judge.

## I.  INTRODUCTION

Plaintiff Oswaldo Nieves, Jr. ("Mr. Nieves") commenced this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. § 405(g).  Mr. Nieves seeks review of the decision by the Commissioner (the "Commissioner") of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB") under the Act.  Mr. Nieves contends that the decision of the Administrative Law Judge ("ALJ") dated December 3, 2019 (the "ALJ Decision") was erroneous, not supported by substantial evidence, and/or contrary to law, and asks the Court to reverse the Commissioner's finding that he was not disabled and remand to the Commissioner for an award of DIB benefits or a new hearing.  (ECF No. 1).

The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  On October 28, 2021, Mr. Nieves filed a motion for judgment on the pleadings (ECF No. 27 ("Mr. Nieves's Motion")), on February 25, 2022, the Commissioner cross-moved (ECF No. 31 (the "Commissioner's Motion")), and on March 16, 2022, Mr. Nieves filed a

reply memorandum of law in further support of her Motion.  (ECF No. 33).  For the reasons set forth below, Mr. Nieves's Motion is GRANTED, the Commissioner's Motion is DENIED, and this matter is remanded for further proceedings.

## II.    BACKGROUND

### A.  Procedural Background

On March 27, 2018, Mr. Nieves filed an application for DIB, alleging a disability onset date of January 18, 2018.  (Administrative Record ("R.") 158 (ECF Nos. 20–20-1)).  On June 1, 2018, the SSA denied Mr. Nieves' application.  (R. 10).  After Mr. Nieves requested a hearing before an ALJ, on October 2, 2019, ALJ Martha Bower conducted a hearing (the "Hearing").  (R. 46–57).  On December 3, 2019, ALJ Bower issued her Decision finding that Mr. Nieves was not disabled.  (R. 10–18).  On August 25, 2020, the ALJ Decision became the final decision of the Commissioner when the Appeals Council denied review.  (R. 1–5).

### B.  Factual Background

#### 1.  Non-medical evidence

Mr. Nieves was born in 1980 and was 37 years old on the alleged onset date.  (R. 59).  In 2002, Mr. Nieves finished attending college.  (R. 189).  From July 2003 until January 2018, Mr. Nieves was employed as a police officer with the New York City Police Department ("NYPD").  (Id.)  Mr. Nieves' responsibilities with the NYPD included patrol, and later, office work.  (R. 49, 190).

On January 9, 2014, while attempting to make an arrest, Mr. Nieves fell down a flight of stairs and was injured, with symptoms including tightness in his lower back and pain emanating down his legs, which worsened into weakness in his legs.  (R. 48, 230).  Mr. Nieves continued to

work full-duty until he was injured a second time, in 2015, lifting barricades.  (R. 49).  Following this injury, Mr. Nieves was placed on limited duty performing office work.  (Id.)

On June 14, 2016, the NYPD Medical Board recommended disapproval of Mr. Nieves' application for retirement with a disability.  (R. 259).  In January 2017, the Medical Board reaffirmed its disapproval after a review of medical evidence from several sources including Mr. Nieves' neurosurgeon, Allyne Fraser, M.D, and Inocencia Carrano, M.D., a physical medicine and rehabilitation specialist and spinal cord injury specialist.  (R. 259–62).  On September 26, 2017, the Medical Board reviewed new evidence in support of Mr. Nieves' disability application.  (See R. 263–65). This evidence included notes from Dr. Carrano, who recommended epidural steroidal injections and referred Mr. Nieves for neurosurgery.  (R. 264).  After reviewing recent medical evidence and conducting a physical examination, the NYPD Medical Board recommended granting Mr. Nieves' application for disability.  (R. 265).  On January 10, 2018, the Board of Trustees of the NYPD Pension Fund passed a resolution stating that Mr. Nieves' retirement status was "Ordinary Disability."  (R. 266).

Mr. Nieves can shower and dress himself daily, although he does not cook, clean, launder his clothing, or shop.  (R. 270).

### 2.  **Medical evidence**

The parties have each submitted summaries of the medical evidence, which are largely consistent, albeit with different levels of detail.  (ECF Nos. 28 at 7–10; 32 at 9–16).  The Court summarizes the medical evidence relevant to the ALJ Decision and the Court's review.  Because the Court finds that the ALJ's evaluation of the opinion evidence requires remand, (see infra § IV.A), this summary focuses on the medical opinions.

### a.  **Summary of back injury evidence**

An MRI on March 10, 2015 documented an L2-3 central disc herniation, and L4-5 anterior spondylosis[1] with central and right paracentral disc herniation.  (R. 230).  After physical therapy and chiropractic treatment were unsuccessful, on July 6, 2015, Mr. Nieves underwent an L4-5 microdiscectomy and laminectomy.[2]  (Id.; R. 49, 269).

An MRI dated October 27, 2016, following surgery, showed "a right L4-5 paracentral disc protrusion indenting the thecal sacrum creating right lateral recess and borderline central canal narrowing" as well as mild L4-5 neuroforaminal narrowing and a small disc protrusion at L2-3. (R. 230).

Dr. Carrano treated Mr. Nieves on several occasions in 2017.  (See R. 230–41).  In response to constant and sharp radiating pain down the lower extremities, exacerbated by "prolonged sitting and standing," as well as sitting, bending, twisting, driving, and lifting, Dr. Carrano recommended epidural steroid injections.  (See R. 230, 233).  Two injections did not provide relief, and Dr. Carrano recommended that "he needs neurosurgical intervention."  (R. 235).  Mr. Nieves did not have surgery because of his discharge from the NYPD, and because he was "[f]rightened of neurosurgery."  (See R. 236, 238).  In Dr. Carrano's final treatment note, dated

---

[1] Spondylosis "is defined as stiffening of the vertebrae," and is "often applied nonspecifically to any lesion of the spine of a degenerative nature."  Mason v. Comm'r of Soc. Sec., No. 20 Civ. 7648 (SDA), 2022 WL 819775 at *4 n.9 (S.D.N.Y. Mar. 18, 2022) (internal citation omitted).

[2] A microdiscectomy is a surgical procedure generally performed for a herniated disc, which "relieves the pressure on a spinal nerve root by removing the material causing the pain."  Arzu v. Saul, 19 Civ. 6451 (VSB) (BCM), 2020 WL 9596205, at 6 n. 8 (S.D.N.Y. Nov. 20, 2020) (quoting Eric Elowitz, Microdiscectomy (Microdecompression) Spine Surgery, Spine-Health, https://www.spine-health.com/treatment/back-surgery/microdiscectomy-microdecompression-spine-surgery (last visited Mar. 30, 2022)).  Similarly, laminectomy is a surgery that relieves pressure on the spinal cord "by removing the lamina — the back part of a vertebra that covers [the] spinal canal."  Laminectomy, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited Mar. 30, 2022).

December 7, 2017, he documented a "stiff gait," "manageable" pain at a 3-4/10 level, positive straight leg tests, weakness, and decreased sensation at L3-S1.  (R. 238).

Through 2018 and 2019, Mr. Nieves had follow-up appointments at Crystal Run Healthcare.  (See R. 282–386).  At an annual examination on July 31, 2018, Mr. Nieves reported chronic midline low back pain at a 6/10 level with right sided sciatica.  (R. 284).  His doctor, Shawkat Massih, M.D., directed him to follow up with a pain management specialist.  (Id.)  At a follow up appointment on August 30, 2018, Mr. Nieves reported pain at a 6/10 level in his lower back and right leg with tightness and popping, which worsened with bending but improved with medications.  (R. 290).  Mr. Nieves reported that Gabapentin[3] provided "some" relief but he stopped taking it.  (Id.) His doctor, Konstantin Lipelis, M.D., diagnosed chronic midline low back pain with right-sided sciatica, other chronic pain, and myofascial pain syndrome status post spinal surgery.  (R. 293).  Dr. Lipelis prescribed medications including Gabapentin and Cymbalta.[4]  (Id.)  Dr. Lipelis noted that the straight leg raise was negative, muscle strength was undiminished and there was moderate bilateral lumbar and thoracic paraspinal pain, worse on the right side, but no pain bilaterally at facet loading.  (R. 292).

At a follow up appointment on September 27, 2018, Dr. Lipelis rendered substantially the same assessment, and continued the prescriptions for Gabapentin, Cymbalta, and Amlodipine. (R. 310–11).  After an examination, Dr. Lipelis observed that Mr. Nieves' gait was normal, he had

---

[3] Gabapentin "is an anticonvulsant medication that affects chemicals and nerves in the body involved in the cause of seizures and some types of pain."  Mason, 2022 WL 819775 at *1 n.2 (citation omitted).
[4] Cymbalta (Duloxetine) is a serotonin-norepinephrine reuptake inhibitor (SNRI) used to treat nerve pain due to medical conditions including chronic back pain or fibromyalgia, among other applications.  See Cymbalta – Uses, Side Effects, and More, Web-MD, https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited Mar. 30, 2022).

pain bilaterally with facet loading, undiminished muscle strength, and negative straight leg raise. (R. 310).  At follow up appointments in 2019 , Dr. Lipelis assessed lumbar radiculopathy, and documented negative SLR tests and no pain bilaterally at facet loading.[5]  (R. 337–38, 364–65, 370).  In an appointment dated August 14, 2019, Mr. Nieves reported continuing 6/10 pain, improved with twice-daily Cymbalta and Gabapentin and Flexeril as needed.  (R. 367).

Mr. Nieves had a physical therapy evaluation of his back on September 5, 2018, and a re-evaluation, following a course of physical therapy, on February 25, 2019.  (R. 295–99, 304–17, 322–34, 340–48).  At the February 25, 2019 re-evaluation, his physical therapist noted that he continued to present persistent pain on the left side, had an antalgic gait, documented positive findings on the straight leg raise test, and had improving core strength, with limited left side range of motion.  (R. 341).

### b.  Examination by Jay Dinovitser, D.O.

On May 22, 2018, Jay Dinovitser, D.O., performed an internal medical examination of Mr. Nieves.  (R. 269).  Dr. Dinovitser prescribed Gabapentin, 400 milligrams nightly plus 100 milligrams twice per day (totaling 600 milligrams daily), Diclofenac, and Metoprolol, for high blood pressure.  (Id.)  Mr. Nieves reported low back pain, radiating at times to the lower extremities, and being unable to bend.  (Id.)

In a physical examination, Dr. Dinovitser noted that Mr. Nieves ambulated with a "mildly slow gait," and could walk on his toes with difficulty, although he was incapable of walking on his

---

[5] Radiculopathy is "disorder of the spinal nerve roots."  Radiculopathy, Stedman's Medical Dictionary (Nov. 2014 ed.); see, e.g., Mason, 2022 WL 819775, at *3, 12–13 (concluding that RFC determination that claimant with radiculopathy and degenerative disc disease could perform sedentary work with postural limitations was not supported by substantial evidence).

heels.  (R. 270).  Mr. Nieves was able to rise to a standing position without difficulty and did not use an assistive device, although he needed to hold an object for support while squatting a one-third distance.  (Id.)  Mr. Nieves had full flexion and extension in the cervical spine, although there was moderate tenderness to the thoracic spine and lumbar spine, and range of motion in the lumbar spine range was limited.[6]  (R. 271).  Dr. Dinovitser also noted that Mr. Nieves' right lower extremity strength was diminished by 20% and the standing leg raise test (SLR) was positive 30 degrees bilaterally and repeated at the seated position.[7]  (Id.)  Dr. Dinovitser noted that an x-ray of the lumbosacral spine revealed no acute abnormality, and he diagnosed Mr. Nieves with low back pain, hypertension, and asthma, with a fair prognosis.  (R. 271–72).  In a Medical Source Statement, he noted "marked" limitations in bending, lifting, and carrying; "moderate" limitations in pushing, pulling, standing, walking, and climbing; "mild" limitations in sitting; and recommended that Mr. Nieves must avoid exposure to respiratory irritants.  (R. 272).

---

[6] Dr. Dinovitser noted that lumbar spine flexion was 45 degrees, extension was 10 degrees and lateral/side bending was 15 degrees.  (R. 271); see Satterfield v. Maldonado, 127 F. Supp. 3d 177, 187 n. 9 (S.D.N.Y. 2015) (setting forth "normal" values for range of motion in the lumbar spine's flexion, extension and lateral flexion).

[7] "The straight leg raise test checks the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression.  Generally, in a straight-leg raising test, the patient is in the supine position with the knee and hip extended and there is passive dorsiflexion of the foot, where back pain indicates nerve root compression or impingement."  Rosado v. Saul, No. 19 Civ. 8073 (PED), 2021 WL 22153, at *3 n.4, 17 (S.D.N.Y. Jan. 4, 2021) (ordering remand where, among other deficiencies, ALJ's findings that plaintiff met walking requirement for light work was undermined by consistent physical examinations showing abnormal gait, positive SLR tests, limited range of motion, pain, and loss of strength) (cleaned up).

### c.  H. Miller, M.D – non-examining Agency consultant

On June 1, 2018, SSA Agency consultant H. Miller, M.D. reviewed a portion of the record and issued an opinion concerning Mr. Nieves' limitations.  (R. 62–65).[8]  Dr. Miller noted that Mr. Nieves' fall while on-duty with the NYPD was an "inciting event for his lower back pain, which progressively worsened," and noted medical treatment including a 2015 microdiscectomy and multiple epidural steroid injections (ESI).  (R. 65).  Dr. Miller opined that Mr. Nieves had limitations of "reduced ROM, [and] pain" and could occasionally lift or carry 20 pounds, climb, balance, stoop, kneel, crouch, and crawl; frequently lift 10 pounds, and stand, walk or sit for six hours in a workday.  (R. 64).

### C.  Administrative Proceedings

#### 1.  ALJ Hearing

On October 2, 2019, ALJ Bower conducted the ALJ Hearing, with Mr. Nieves and Vocational Expert ("VE") Estelle Hutchinson testifying in-person.  (R. 46–57).

Mr. Nieves testified briefly about his work with the NYPD and about his back injury, daily activities, and limitations.  Mr. Nieves lives with his retired mother.  (R. 50).  Mr. Nieves can drive his mother for shopping trips, but does not do other household chores.  (R. 51–52).  His mother launders his clothing.  (R. 52).  Mr. Nieves testified that he typically watches television lying down to minimize discomfort and is cautious whenever he bends over.  (R. 50–51).  Mr. Nieves stated that he avoided lifting more than approximately three pounds, and lays down five to six times daily, for approximately 30 minutes.  (R. 53).  Mr. Nieves described that due his medications, he

---

[8] The Commissioner acknowledges that Dr. Miller "reviewed only a part of the records" but argues that the ALJ fairly considered Dr. Miller's opinion in light of the total record evidence and notes that later records were consistent with those reviewed by Dr. Miller.  (ECF No. 32 at 20).

"wasn't concentrating well at work" and "wasn't able to perform my duty because of the concentration level." (R. 49–50).

VE Hutchinson testified that a hypothetical claimant of Mr. Nieves' age, education, and vocational background could perform light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling, as a light delivery driver, parking lot attendant, and cashier. (R. 54–55). The VE testified that at the sedentary exertion level, the hypothetical individual could work as a telephone order clerk, assembler, and inspector. (R. 55). The VE testified that lying down for half an hour during the workday would preclude employment, as would more than one monthly absence. (R. 56).

### 2.  The ALJ Decision and Appeals Council Review

On December 3, 2019, ALJ Bower issued her Decision finding Mr. Nieves not disabled and denying his application for DIB benefits. (R. 10–18). The ALJ followed the five-step disability determination process. (See id.; 20 C.F.R. § 404.1520(a)(4)(i)–(v)). As a preliminary matter, the ALJ determined that Mr. Nieves met the insurance requirements through December 31, 2022. (R. 12).

At step one, ALJ Bower determined that Mr. Nieves had not engaged in substantial gainful activity since the onset date. (R. 12). At step two, ALJ Bower determined that Mr. Nieves had two severe impairments: (i) lumbar spine degenerative disc disease, following his 2015 laminectomy and discectomy; and (ii) chronic pain syndrome. (Id.)

At step three, ALJ Bower determined that none of Mr. Nieves's impairments were of a severity to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526) (the "Listings"). (R. 13). In

reaching that conclusion, the ALJ rejected the Listings in section 1.00 (musculoskeletal disorders), noting that the record had no evidence of "major dysfunction of the spine," any specified neurological defects, or "the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication." (Id.) The ALJ also noted that there was no evidence that Mr. Nieves' impairment resulted in an inability to ambulate or "perform fine and gross movements effectively." (Id.)

Before moving to step four, the ALJ determined that Mr. Nieves had the residual functional capacity ("RFC") to perform "light work" with "occasional climbing of ramps, stairs, ropes, ladders and scaffolds and occasional balancing, stooping, kneeling, crouching, and crawling." (R. 13 ("Mr. Nieves's RFC")).[9] The ALJ predicated her RFC determination on a review of Mr. Nieves' subjective complaints, documents within the NYPD's Worker's Compensation file (which deemed him eligible for 75% disability), records of Mr. Nieves' medical treatment and opinion evidence. (See R. 14–16). The ALJ acknowledged Mr. Nieves' subjective complaints, but deemed his "limited range of daily activities" to be "a lifestyle choice." (R. 14).

ALJ Bower acknowledged a "significant" history of low back pain predating the onset date, spinal surgery—a 2015 laminectomy and discectomy—and treatment with steroidal injections and physical therapy. (R. 14). The ALJ repeatedly described the medical treatment to be "conservative," and noted that "he has not required any surgical intervention." (R. 15).

---

[9] "Light work" requires the ability to lift up to 20 pounds, with "frequent" lifting or carrying of 10-pound objects, and "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Disability Insurance: SSR 83-10: Titles II And XVI: Determining Capability To Do Other Work -- The Medical-Vocational Rules Of Appendix 2, 1983 WL 31251; 20 C.F.R. § 404.1567.

After describing several MRIs documenting disc herniations, anterior spondylosis, disc protrusions, neuroforaminal narrowing and central canal narrowing, the ALJ stated that the "diagnostic imaging . . . has routinely been either mild, moderate, or unremarkable (Exhibit 15F & 24F)."  (R. 14–15).  The final exhibit in the Record is, however, 6F.  (See R. 386).  The ALJ noted that medical records from after July 2018 documented moderate muscular pain, intact muscular strength, normal gait, and negative straight leg raising bilaterally.  (R. 15).

The ALJ evaluated the medical opinions of consultative examiner Dr. Dinovitser and non-examining agency doctor Miller.  (R. 15–16).  The ALJ found "partially persuasive" Dr. Dinovitser's opinion that Mr. Nieves had marked limitations in bending, lifting, and carrying, and moderate limitations in pushing, pulling, standing and walking, and climbing stairs.  (R. 16).  Explaining his reasoning, the ALJ stated Dr. Dinovitser's opinion was "not couched in functional terms."  (Id.)  Second, noting the "strictly conservative" medical treatment, and other findings, the ALJ determined there were "at most moderate limitation[s] in lifting, carrying, and bending."  (Id.)  The ALJ deemed persuasive the opinion of non-examining Dr. Miller, who opined that Mr. Nieves "was capable of light work with postural restrictions."  (R. 15).

At step four, the ALJ determined that Mr. Nieves was unable to perform his past relevant work as a police officer.  (R. 16–17).  At step five, the ALJ determined that based on Mr. Nieves's age, education, work experience, and RFC, that jobs exist in significant numbers in the national economy that he could perform, as a driver, parking lot attendant, cashier, telephone order clerk, assembler, and inspector.  (R. 17–18).  For these reasons, the ALJ concluded that Mr. Nieves was not disabled.  (R. 18).

On August 25, 2020, the Appeals Council denied review.  (R. 1–5).

### III.      LEGAL STANDARDS

#### A.  Standard of Review

Under Rule 12(c), a party is entitled to judgment on the pleadings if she establishes that no material facts are in dispute and that she is entitled to judgment as a matter of law.  <u>See</u> <u>Burnette v. Carothers</u>, 192 F.3d 52, 56 (2d Cir. 1999); <u>Morcelo v. Barnhart</u>, No. 01 Civ. 743 (RCC) (FM), 2003 WL 470541, at *4 (S.D.N.Y. Jan. 21, 2003).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).   A court may set aside the Commissioner's decision denying SSI benefits if it is not supported by substantial evidence or was based on legal error.  <u>See</u> <u>Moran v. Astrue</u>, 569 F.3d 108, 112 (2d Cir. 2009).  Judicial review, therefore, involves two levels of inquiry.  First, the Court must decide whether the ALJ applied the correct legal standard.  <u>See</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Calvello v. Barnhart</u>, No. 05 Civ. 4254 (SCR) (MDF), 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008).  Second, the Court must decide whether the ALJ's decision was supported by substantial evidence in a sufficiently developed record.  <u>Tejada</u>, 167 F.3d at 774; <u>Calvello</u>, 2008 WL 4452359, at *8; <u>Moran</u>, 569 F.3d at 114.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  <u>Longbardi v. Astrue</u>, No. 07 Civ. 5952 (LAP), 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008) (citation omitted).  The substantial evidence test applies not only to the factual findings,

but also to the inferences and conclusions drawn from those facts.  See, e.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999).  In determining whether the record contains evidence to support the denial of claims, the Court must consider the whole record, and weigh all evidence to ensure that the ALJ evaluated the claim fairly.  See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999).  The Commissioner, not the Court, resolves evidentiary conflicts and appraises the credibility of witnesses, including the claimant.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Moreover, disability-benefits proceedings are non-adversarial in nature, and therefore, the ALJ has an affirmative obligation to develop a complete record, even when the claimant is represented by counsel.  See Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 508–09 (2d Cir. 2009). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from his or her medical sources.  20 C.F.R. § 404.1512b.  Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."  Casino-Ortiz v. Astrue, No. 06 Civ. 155 (DAB) (JCF), 2007 WL 2745704, at *7 (S.D.N.Y. Sept. 21, 2007).  When there are inconsistencies, gaps, or ambiguities in the record, the regulations give the ALJ options to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others.  See 20 C.F.R. § 404.1520(b).

The Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings:  "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see Butts v.

Barnhart, 388 F.3d 377, 382 (2d Cir. 2004).  If "there are gaps in the administrative record or the ALJ has applied an improper legal standard," the Court will remand the case for further development of the evidence or for more specific findings.  Rosa v. Callahan, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).  Remand is "particularly appropriate" where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39.  If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may also be appropriate.  See, e.g., Butts, 388 F.3d at 386 (discussing Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000)).

**B.  Eligibility for Benefits**

For purposes of DIB benefits, one is "disabled" within the meaning of the Act, and thus entitled to such benefits, when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(3)(A).  The Act also requires that the impairment be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(3)(B).  In reviewing a claim of disability, the Commissioner must consider:  "(1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to

by claimant and other witnesses; and (4) the claimant's background, age, and experience."

Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988).

Under the applicable regulations, an alleged disability is evaluated under the sequential five-step process set forth in 20 C.F.R. § 404.1520(a)(4)(i)–(v).  The Second Circuit has described the process as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity.  If not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on the medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the Claimant could perform.

Bush v. Shalala, 94 F. 3d 40, 44–45 (2d Cir. 1996) (quoting Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983)).

At the first four steps, the claimant bears the burden of proof.  At the fifth step, the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform.  See, e.g., Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).  In meeting the burden of proof at the fifth step, the Commissioner can usually rely on the Medical-Vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, known as "the Grid." Zorilla v. Chater, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996).

### C. **_Evaluation of Medical Opinion Evidence_**

For benefits applications filed before March 27, 2017, the SSA's regulations required an ALJ to give more weight to those physicians with the most significant relationship with the claimant.  See 20 C.F.R. § 404.1527; see also Taylor v. Barnhart, 117 F. App'x 139, 140 (2d Cir. 2004).  Under this "Treating Physician Rule," an ALJ was required to "give good reasons" Kevin E. v. Comm'r of Soc. Sec., No. 1:19-CV-593 (EAW), 2021 WL 1100362, at *4 (W.D.N.Y. Mar. 23, 2021) (quoting former 20 C.F.R. § 404.1527(c)(2)), if he or she determined that a treating physician's opinion was not entitled to "controlling weight," or, at least, "greater weight" than the opinions of non-treating and non-examining sources.  Gonzalez v. Apfel, 113 F. Supp. 2d 580, 588–89 (S.D.N.Y. 2000).  In addition, under the Treating Physician Rule, a consultative physician's opinion was generally entitled to "little weight."  Giddings v. Astrue, 333 F. App'x 649, 652 (2d Cir. 2009).

On January 18, 2017, the SSA published comprehensive revisions to the regulations regarding the evaluation of medical evidence, revisions that were effective on March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F. R. 5844-01, 2017 WL 168819 (Jan. 18, 2017).  These new regulations reflect a move away from a perceived hierarchy of medical sources.  See id.  The regulations now provide that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."[10]  20

---

[10] The new regulations define "prior administrative medical finding" as:

> [A] finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as: (i) The existence and severity of your impairment(s); (ii) The existence and severity of your symptoms; (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of

C.F.R. § 404.1520c(a).  See Young v. Kijakazi, No. 20 Civ. 3604 (SDA), 2021 WL 4148733, at *9

(S.D.N.Y. Sept. 13, 2021).  Instead, an ALJ must consider all medical opinions in the record and

"evaluate their persuasiveness" based on five "factors": (1) supportability, (2) consistency, (3)

relationship of the source with the claimant, (4) the medical source's specialization, and (5) any

"other" factor that "tend[s] to support or contradict a medical opinion[.]"   20 C.F.R. §

404.1520c(c)(1)–(5).

       The ALJ's duty to articulate a rationale for each factor varies.  20 C.F.R. § 404.1520c(a).

Under the new regulations, the ALJ must "explain," in all cases, "how [he or she] considered"

both the supportability and consistency factors, as they are "the most important factors."  Id.

§ 404.1520c(b)(2); see Young, 2021 WL 4148733, at *9 (describing supportability and consistency

as "the most important" of the five factors).  As to supportability, "the strength of a medical

opinion increases as the relevance of the objective medical evidence and explanations presented

by the medical source increase."  Vellone v. Saul, No. 20 Civ. 261 (RA) (KHP), 2021 WL 319354, at

*6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. § 404.1520c(c)(1)), adopted by, 2021 WL 2801138

(S.D.N.Y. July 6, 2021).   Consistency "is an all-encompassing inquiry focused on how well a

medical source is supported, or not supported, by the entire record."  Id.; see 42 U.S.C. § 423(f)

(requiring ALJ to base decision on "all the evidence available in the" record).

---

          Impairments in Part 404, Subpart P, Appendix 1; (iv) If you are a child, statements about
          whether your impairment(s) functionally equals the listings in Part 404, Subpart P,
          Appendix 1; (v) If you are an adult, your [RFC]; (vi) Whether your impairment(s) meets the
          duration requirement; and (vii) How failure to follow prescribed treatment (see
          § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.
    20 C.F.R. § 416.913(a)(5).

As to the three remaining factors—relationship with the claimant, specialization, and "other"—the ALJ is required to consider, but need not explicitly discuss them, in determining the persuasiveness of the opinion of a medical source.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds two or more medical opinions to be equally supported and consistent with the record, but not identical, the ALJ must articulate how he or she considered those three remaining factors.  See id. § 404.1520c(b)(3).

Several opinions among the district courts within the Second Circuit applying the new regulations have concluded that "the essence" of the Treating Physician Rule "remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar."  Acosta Cuevas v. Comm'r of Soc. Sec., No. 20 Civ. 502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (surveying district court cases in the Second Circuit considering the new regulations), adopted by 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022); see Prieto v. Comm'r of Soc. Sec., No. 20 Civ. 3941 (RWL), 2021 WL 3475625, at *9 (S.D.N.Y. Aug. 6, 2021) (noting that under both the Treating Physician Rule and the new regulations, "an ALJ's failure to properly consider and apply the requisite factors is grounds for remand."); Dany Z. v. Saul, No. 2:19-CV-217 (WKS), 2021 WL 1232641, at *12 (D. Vt. Mar. 31, 2021) (surveying Second Circuit district courts that "have concluded that the factors are very similar to the analysis under the old [Treating Physician] [R]ule"); Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (noting that "consistency and supportability" were "the foundation of the treating source rule"); see also Brianne S. v. Comm'r of Soc. Sec., No. 19-CV-1718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide explicit discussion of supportability and consistency of two

medical opinions, because ALJ's "mere[] state[ment]" that examining physician's opinion was not consistent with overall medical evidence was insufficient).

### D.  Assessing a Claimant's Subjective Allegations

In considering a claimant's symptoms that allegedly limit his or her ability to work, the ALJ must first determine "whether there is an underlying medically determinable physical or mental impairment(s) — i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques — that could reasonably be expected to produce the claimant's pain or other symptoms." 20 C.F.R. § 404.1529(c).  If such an impairment is found, the ALJ must next evaluate the "intensity, persistence, and limiting effects" of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations.   20 C.F.R. § 404.1529(c)(1).   To the extent that the claimant's expressed symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the claimant's credibility.  See Meadors v. Astrue, 370 F. App'x 179, 183–84 (2d Cir. 2010); Taylor v. Barnhart, 83 F. App'x 347, 350–51 (2d Cir. 2003).

Courts have recognized that "the second stage of [the] analysis may itself involve two parts." Sanchez v. Astrue, No. 07 Civ. 931 (DAB), 2010 WL 101501, at *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)."  Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. § 404.1529(c)(3)]."  Id. (citing Gittens v. Astrue, No. 07 Civ. 1397 (GAY), 2008 WL 2787723, at *5 (S.D.N.Y. June 23, 2008)).

These seven factors include:  (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3); see Bush, 94 F.3d at 46 n.4.  If the ALJ does not follow these steps, remand is appropriate.  Sanchez, 2010 WL 101501, at *15.

## IV.    DISCUSSION

### A.    The RFC Determination Is Not Supported By Substantial Evidence.

Mr. Nieves argues that remand is required for the following reasons:  (1) the ALJ failed to develop the record and did not obtain medical records from Montefiore Medical Center and treating physician Dr. Fraser; (2) the ALJ erroneously evaluated the opinion evidence; (3) the ALJ misrepresented the medical evidence; (4) the RFC determination failed to account for Mr. Nieves' asthma; and (5) the ALJ did appropriately consider Mr. Nieves' credibility, including the side effects of his medications.  (ECF No. 28 at 14–21).  The Court concludes that the ALJ failed to properly evaluate the opinion evidence under the new regulations, and therefore does not reach Mr. Nieves' additional arguments.

In fashioning the RFC determination, the ALJ considered the medical opinions of Dr. Dinovitser, a consultative examiner, and Dr. Miller, a non-examining SSA expert.  (R. 15–16).  The ALJ deemed persuasive Dr. Miller's opinion that Mr. Nieves was capable of light work with

postural limitations, and deemed only "partially persuasive" Dr. Dinovitser's opinion of moderate and marked limitations in a range of postural activities.  (R. 15–16).  The Court finds that the ALJ's evaluation of Dr. Miller's opinion was conclusory, and did not address the supportability and consistency factors of the new regulations.  To the contrary, the ALJ stated only that Dr. Miller was "duly qualified by virtue of their education, training, and experience" and "Dr. Miller reviewed treatment evidence and made conclusions based on that evidence."  (R. 15–16).  Under the new regulations, an ALJ must consider all medical opinions in the record and "evaluate the persuasiveness" based on five "factors": (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any "other" factor that "tend[s] to support or contradict a medical opinion."   20 C.F.R. § 416.920c(a)–(c)(1)–(5).  The ALJ's analysis of Dr. Miller's opinion, which was brief and did not discuss the supportability of the decision, is insufficient and requires remand under the new regulations.  See Acosta Cuevas, , 2021 WL 363682, at *14–15 (finding ALJ's supportability and consistency analysis of non-examining consulting doctors' opinions insufficient and recommending remand); Rua-Campusano v. Kijakazi, No. 20 Civ. 7087 (GBD) (SLC), 2021 WL 7287628, at * (S.D.N.Y. Dec. 10, 2021) ("[T]he ALJ's brief, categorical dismissal of the three medical opinions without discussing supportability or persuasiveness is not sufficient under the new regulations."), adopted by 2022 WL 493390 (S.D.N.Y. Feb. 17, 2022).

There are multiple aggravating factors resulting from the ALJ's failure to properly consider Dr. Miller's opinion, such that this error was not harmless.  First, Dr. Miller's opinion cannot alone constitute substantial evidence given that he never personally examined Mr. Nieves, and, as conceded by the Commissioner, did not review recent medical records.  (ECF No. 32 at 20); compare Hernandez v. Comm'r of Soc. Sec, No. 20 Civ. 5760 (PKC), 2022 WL 604005, at *6

(E.D.N.Y. Mar. 1, 2022) (finding RFC determination unsupported by substantial evidence under the new regulations where the ALJ did not have medical opinions from any treating sources, and assigned greater weight to a non-examining expert who did not have recent records over a consultative examiner who asserted marked limitations); with Salanti v. Saul, 415 F. Supp. 3d 433, 454–55 (S.D.N.Y. 2019) (finding support for ALJ's decision to accord great weight to non-treating consultative examiners where the ALJ discussed the opinions "at length" and properly found these opinions consistent with substantial evidence); cf. Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013) ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination").

Second, the ALJ mischaracterized the medical evidence and misstated the evidence, frustrating the Court's review of the ALJ Decision. The ALJ Decision states:

> the claimant's allegations of debilitating back pain are not well supported in his diagnostic imaging, which has routinely been either mild, moderate, or unremarkable (Exhibit 15F & 24F). Conservative treatment has kept the claimant functional and he has not required any surgical intervention.

(R. 15).

There are several problems with this portion of the ALJ Decision. As Mr. Nieves correctly observes, "[t]here are no exhibits 15F or 24F in the record so it is entirely unclear what the ALJ is referring to." (ECF No. 28 at 18). Moreover, the Record undermines this quoted portion of the Decision. The diagnostic imaging in the record is not "mild, moderate, or unremarkable." (R. 15). To the contrary, 2015 MRI records documented an L2-3 central disc herniation, and L4-5 anterior spondylosis with central and right paracentral disc herniation. (R. 230). After failing physical therapy, in July 2015, Mr. Nieves underwent an L4-5 microdisectomy, after which, in 2016, an MRI documented "a right L4-5 paracentral disc protrusion indenting the thecal sacrum creating

right lateral recess and borderline central canal narrowing," as well as mild L4-5 neuroforaminal narrowing and an L2-3 small disc protrusion.  (Id.)

The ALJ's repeated representations that treatment was "conservative," and that Mr. Nieves did not require surgical interventions, are also misleading and incorrect.  (R. 15–16).  As noted elsewhere in the ALJ Decision, Mr. Nieves did have spinal surgery — the 2015 L4-5 laminectomy and discectomy — and even after this surgery, and several steroidal injections, his treating physician determined that "he needs neurosurgical intervention."  (R. 14, 230, 235). Thus, the ALJ erred "as a matter of law" in characterizing Mr. Nieves' treatment as "conservative," as "a claimant's treatment is not conservative merely because it consists of non-surgical treatments, such as prescription drugs, physical therapy, and epidural steroid injections." Scognamiglio v. Saul, No. 432 F. Supp. 3d 239, 249–50 (E.D.N.Y. 2020) (collecting cases and remanding where "ostensibly conservative treatment was evidently a key factor in the ALJ's conclusion" yet claimant was prescribed opiate medications, participated in physical and chiropractic therapy, and received acupuncture and epidural injections) (internal citations omitted).  The Court similarly concludes from its review of the ALJ Decision that the purportedly conservative nature of the treatment factored prominently—and improperly—into the ALJ's analysis, as he referenced it repeatedly.  (See R. 15–16).[11]

---

[11] See R.15 ("It comports with his treatment history, which has been conservative, consisting primarily of injections, medication management and several courses of physical therapy"); 15 ("Given the evidence of conservative treatment . . ."); 16 ("His care has been strictly conservative")); 16 ("the conservative degree of treatment the claimant has received").

B. **Additional Arguments**

Because remand is warranted due to the ALJ's errors described <u>supra</u>, the Court will not address the parties' additional arguments.  <u>See</u> <u>Mack v. Comm'r of Soc. Sec.</u>, No. 20 Civ. 2722 (RA) (SLC), 2021 WL 3684081, at *19 (S.D.N.Y. July 26, 2021) (not reaching challenge to VE testimony after determining that evaluation of the opinion evidence and RFC analysis errors required remand), <u>adopted by</u> 2021 WL 3683628 (S.D.N.Y. Aug. 17, 2021).  To provide guidance on remand, however, the Court briefly notes several areas warranting more fulsome treatment on remand.

First, although unchallenged by Mr. Nieves, the Court finds that the ALJ's step three Listing analysis was conclusory and did not specifically address the evidence.  (<u>See</u> R. 13).  On remand, the ALJ should provide an explanation addressing Listing 1.04(A) in light of the record evidence.  Listing 1.04(A) is met by evidence of degenerative disc disease with "(1) nerve root or spinal cord compromise, with (2) neuro-anatomic distribution of pain, (3) limitation of motion in [the] spine, and (4) motor loss, accompanied by sensory or reflex loss and a positive straight-leg raising test."  <u>Riddick v. Saul</u>, No. 20-CV-5396 (AMD), 2022 WL 784722, at *2 (E.D.N.Y. Mar. 15, 2022); <u>see</u> 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 1.04(A).[12]  "[W]here there is record evidence that appears to support a conclusion that most or all of the elements of a Listing are met, an ALJ must explain why a claimant's condition does not satisfying the Listing."  <u>Prieto</u>, 2021 WL 3475625, at *15 (collecting cases).  In <u>Prieto</u>, there was evidence that the claimant met many of the Listing 1.04(A) requirements, including degenerative disc disease, severe leg and back pain,

---

[12] On April 2, 2021, Listing 1.04(A) was replaced by Listing 1.15.  <u>See</u> <u>Riddick</u>, 2022 WL 784722, at n. 1 (citing 85 F. R. 79063-01, 2020 WL 7209986).  Listing 1.04(A) applies here because Mr. Nieves' claim was brought before that date.  (<u>See</u> <u>id.</u>)

limited range of motion in the spine, motor loss with muscle weakness, and positive straight leg tests, although the court noted that he may not have met every element.  (See id. at *15–16).  Nevertheless, the court concluded that the ALJ's conclusory statement that recited a portion of the Listing definition, without referencing the record, left it with "no basis on which to evaluate whether substantial evidence supported the ALJ's determination[.]"  Id. at *5, 16.  Here, although Mr. Nieves' impairments may ultimately not satisfy each element of Listing 1.04(A), the Court notes that, as in Prieto, many of the elements do appear to be met, requiring a careful explanation of the record evidence against the Listing requirements.  (See R. 230–40, 259–65, 271–72, 282–85, 290–99, 304–48, 354–58, 362–71).

Second, on remand, the ALJ should address the side effects of Mr. Nieves' medications in the RFC determination.  "In determining a claimant's entitlement to disability, an ALJ must consider medications taken, including their dosage and side effects."  Mack, 2021 WL 3684081, at *18 (quoting Louis v. Berryhill, No. 17 Civ. 5975 (PGG) (RWL), 2018 WL 8545833, at *16 (S.D.N.Y. Oct. 11, 2018) & citing SSR 16-3p, 2017 WL 5180304, at 7–8 (S.S.A. Oct. 25, 2017)).  The failure to consider a claimant's complaints of medication side effects may warrant remand.  See Plaza v. Comm'r of Soc. Sec., No. 19 Civ. 3853 (DF), 2020 WL 6135716, at *23–24 (S.D.N.Y. Oct. 16, 2020) (finding that the ALJ's failure to consider side effects of drowsiness and lack of concentration, which were supported by some objective evidence, was a basis for remand).

Here, Mr. Nieves complained that his medications caused drowsiness and affected his ability to concentrate, such that even when he worked in an office setting, he "wasn't able to perform [his] duty because of the concentration level."  (R. 49–50, 52).  Relatedly, Mr. Nieves testified that he lay down for periods of approximately 30 minutes multiple times per day, which

would preclude employment under the VE's testimony.  (R. 53, 56).  Despite this testimony, nowhere in the RFC determination did the ALJ address the side effects of Mr. Nieves' medications; the only mention of medication side effects in the ALJ Decision was to note that Mr. Nieves "reported some side effects to medication."  (R. 14).  The Court notes that "pharmaceutical literature" documents that Gabapentin may cause side effects including "drowsiness, tiredness, weakness, dizziness, and memory problems."  Caternolo v. Astrue, No. 6:11-CV-6601 (MAT), 2013 WL 1819264, at *11 (W.D.N.Y. Apr. 29, 2013) (remanding where there was no indication that ALJ considered the extensive side effects of claimant's medications). Accordingly, on remand, the ALJ should address these complaints by Mr. Nieves.

## V.  CONCLUSION

For the reasons set forth above, Mr. Nieves's Motion is GRANTED, the Commissioner's Motion is DENIED, and this matter is remanded for further proceedings.  The Clerk of Court is respectfully directed to close ECF Nos. 27 and 31 and to close this case.

Dated:        New York, New York
              March 30, 2022

                                        SO ORDERED.

                                        SARAH L. CAVE
                                        United States Magistrate Judge